**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

LUIS MUNUZURI HARRIS,

        *Plaintiff*,

v.                            Case No. 3:25-cv-224-WWB-SJH

CONOVER, et al.,

        *Defendants*.

_____

## ORDER

THIS CAUSE is before the Court on Defendants' Motion to Dismiss (Doc. 30), with exhibits (Doc. 30-1 through 30-6) and Plaintiff's pro se Response in opposition (Doc. 35), with exhibits (Doc. 35-1 through 35-5).[1]  For the reasons set forth below, Defendants' Motion will be granted.

## I.    PLAINTIFF'S ALLEGATIONS AND DEFENDANTS' MOTION

Plaintiff, an inmate of the Florida Department of Corrections ("**FDOC**"), is proceeding on a pro se Complaint for Violation of Civil Rights under 42 U.S.C. § 1983. (Doc. 1).  Plaintiff names nine Defendants: (1) Sergeant Conover; (2) Warden Goodwin; (3) Officer Bennett; (4) Heather Murphy[2]; (5) Officer Adekayode[3]; (6) John Doe #2; (7)

---

[1] Plaintiff also filed "Amendment Pages to Prior Litigation" (Doc. 32-1) and an "Addendum/Supplement" to his Response in opposition (Doc. 44), both of which the Court has construed as part of his Response.  (Doc. Nos. 45, 48).

[2] Plaintiff's Complaint originally sued "Inspector Whitfield," but the Court granted Whitfield's Motion to Correct Misnomer and directed the Clerk to change the name of Whitfield to Heather Murphy.  (Doc. Nos. 26, 31).

[3] Adekayode was originally John Doe #1.

John Doe #3; (8) John Doe #4; and (9) John Doe #5.[4]  (*Id.* at 1–4).  In his Complaint, Plaintiff alleges that on March 8, 2024, while housed at Suwannee Correctional Institution ("**SCI**"), Defendants coordinated a "hit" on Plaintiff in retaliation for filing grievances and a state court habeas petition related to his medical and confinement conditions, violating his rights under the First and Eighth Amendments.  (*Id.* at 5–7).  He raises the following claims against all Defendants in their individual capacities: conspiracy (Count One); failure to protect (Count Two); battery (Count Three); retaliation (Count Four); and excessive force (Count Five).  (*Id.* at 16).

According to Plaintiff, when he arrived at SCI in December 2023, he began filing grievances related to his need for a medically required diet.[5]  (*Id.* at 8; Doc. 1-1 at 5). Then, on February 1, 2024, Plaintiff was moved from the O-dorm to the L-dorm, which he asserts was done to "exacerbate [his] medical condition."  (Doc. 1 at 8–9).  As a result, on February 5, 2024, Plaintiff filed an "emergency petition" in state court, wherein he alleged that Conover and Goodwin rehoused him to L-dorm in retaliation for his grievances related to his medical diet.[6]  (*Id.* at 8).  Additionally, according to Plaintiff, throughout February 2024, he filed grievances alleging the same thing—that Conover and Goodwin were "engaging in reprisal" by housing and keeping him in L-dorm.  (Doc. 1 at 8–9; Doc. 1-1 at 13–23).  Plaintiff points out that his "housing retaliation grievances"

---

[4] Plaintiff labels these four Doe-Defendants as "Black Muslim Gang-Members Inmates."  (Doc. 1 at 4).

[5] Plaintiff alleges that he is an "immun-compromised [sic] human" suffering from a terminal illness, "to wit: Active Systemic Lupus Erythematosus ("**SLE**"); Active Class 4 and 5 Lupus Nephritis; Decreased Stage-3 Chronic Kidney Disease ("**CKD**"); Bi-lateral DVT's; and Atrial Fibrillation."  (Doc. 1 at 7).

[6] According to Plaintiff, his state court petition was dismissed for failing to pay the filing fee and then dismissed on appeal for lack of jurisdiction.  (Doc. 1 at 8).

were denied on March 7, 2024, the day before the incident giving rise to this action. (Doc. 1 at 9).

With this backdrop, Plaintiff alleges that in the morning hours of March 8, 2024, Conover contacted Adekayode and requested that "3-Black Muslim Inmate Gang-Members" be sent to her office, so Adekayode provided the three inmates with a "movement pass" so they could walk to Conover's office.[7] (Doc. 1 at 9–10). While in her office, Conover provided the three inmates with copies of Plaintiff's grievances that he filed about her and provided them with information about Plaintiff's underlying convictions, one of which being "sexual battery by a law enforcement officer." (*Id.* at 10). Plaintiff contends that Conover also showed the inmates photos of Plaintiff "in full police uniform from 25-years ago during the Plaintiff's police academy tenure." (*Id.* at 11). He alleges Conover then paid the three inmates with cigarettes to "execute [a] hit" on Plaintiff. (*Id.*). According to Plaintiff, these interactions between Conover and the three inmates were "confirmed by Conover's inmate orderlie [sic] (inmate Kelley)." (*Id.*).

Plaintiff asserts that approximately thirty minutes after the meeting in Conover's office, the three gang-member inmates returned to L-dorm, showed Plaintiff's grievances to other inmates, and solicited other "black Muslim Gang Members" to join them in their attack on Plaintiff. (*Id.*). When Plaintiff returned to L-dorm, he was "ambushed by 4-to-5 Black Muslim Gang Members and brutally assaulted, physically beat and stomped to the ground while he screamed for help to save his life[.]" (*Id.*). Plaintiff alleges Conover told Adekayode to exit the unit for about ten minutes, so the wing would be unattended and

---

[7] Plaintiff alleges that Conover is a "young . . . attractive, fit, blonde, white female," who is "notorious for abusing her sexuality—and sexually appealing attributes—to solicit inmates to carry out certain 'favors' for her." (Doc. 1 at 10).

the beating "uninterrupted." (*Id.*). When Adekayode returned, he called in an emergency. (*Id.* at 11–12).

Several officers responded to the scene, including Conover. (*Id.* at 12). According to Plaintiff, Conover instructed Adekayode to report the incident as a fight and issue Plaintiff a disciplinary report for his involvement, which was done to "cover up the executed 'hit.'" (*Id.*). Plaintiff was then taken to medical for his injuries. (*Id.*). Plaintiff alleges that video footage of the incident was subsequently reviewed, and Lieutenant Hale ordered the incident report to be corrected to reflect that Plaintiff was a victim in the attack and that Plaintiff's disciplinary report be nullified. (*Id.*). For the next month, Plaintiff was placed in administrative confinement, during which he "began attempting to exhaust the administrative grievance process" for the March 8, 2024 events. (*Id.*).

Plaintiff alleges that video evidence substantiated his allegations of the entire incident, but that Murphy "maliciously and fraudulently" omitted the video evidence from her investigation and report. (*Id.* at 10–11). Likewise, Murphy failed to "examine and secure [Defendant] Conover's work computer and on-line searches and cites, [and] images, visited." (*Id.*). Plaintiff goes on to allege that he properly exhausted the grievance process or, alternatively, he was excused from exhausting his administrative remedies because the grievance procedure amounted to a dead-end, rendering it unavailable. (*Id.* at 13–15). Plaintiff alleges that "any/all grievances pertaining to [the March 8, 2024] incident or naming Defendants Conover and Goodwin were thwarted" by Bennett, as she either did not submit or discarded his grievances to prevent him from exhausting his administrative remedies. (*Id.*).

4

Plaintiff contends that the March 8, 2024 events were the result of Goodwin, Adekayode, and John Does #2, #3, #4, and #5 (the inmate attackers) acting "in concert" with Conover to violate Plaintiff's First and Eighth Amendment rights.  He further maintains that following the attack, Adekayode, at the direction of Conover, issued a false disciplinary report; Bennett, also at the direction of Conover, "discarded grievances" to "cover-up" the violations; and Murphy deliberately conducted a fraudulent investigation by issuing fraudulent reports and concealing video evidence.  (*Id.*).  As relief, Plaintiff seeks $25,000 in compensatory damages and $25,000 in punitive damages against each Defendant for each alleged violation.  (*Id.* at 6).

Defendants Goodwin, Conover, Murphy, Bennett, and Adekayode now move to dismiss the Complaint on several grounds: Plaintiff failed to disclose his prior litigation history; Plaintiff failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act ("**PLRA**"); the Complaint is a shotgun pleading; Defendants are entitled to immunity for state tort claims; Plaintiff fails to state a claim for retaliation, failure to protect, and excessive force; Plaintiff fails to state a claim under state tort law; Plaintiff fails to allege that he suffered more than de minimis injuries; and Plaintiff's claim for punitive damages is statutorily barred.  (*See generally* Doc. 30).  Plaintiff filed a Response in opposition.  (Doc. Nos. 32-1, 35, 44).  Because the Court finds that the Complaint should be dismissed for Plaintiff's failure to exhaust his administrative remedies, the Court need not address Defendants' other arguments.

## II.    EXHAUSTION

The PLRA requires that Plaintiff exhaust his available administrative remedies before pursuing a § 1983 claim about prison conditions.  *See* 42 U.S.C. § 1997e(a) ("No

action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted."); *see also Woodford v. Ngo*, 548 U.S. 81, 92–93 (2006) (noting that a prisoner must exhaust administrative remedies before challenging the conditions of confinement, and concluding that the PLRA demands "proper exhaustion"). But Plaintiff need not "specially plead or demonstrate exhaustion in [his] complaint[]." *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Instead, the United States Supreme Court has recognized that "failure to exhaust is an affirmative defense under the PLRA[.]" *Id.*

Exhaustion of available administrative remedies is "a precondition to an adjudication on the merits." *Bryant v. Rich*, 530 F.3d 1368, 1374 (11th Cir. 2008); *see also Jones*, 549 U.S. at 211. The Supreme Court has instructed that while "the PLRA exhaustion requirement is not jurisdictional[,]" *Woodford*, 548 U.S. at 101, "exhaustion is mandatory . . . and unexhausted claims cannot be brought," *Pavao v. Sims*, 679 F. App'x 819, 823 (11th Cir. 2017) (citing *Jones*, 549 U.S. at 211). Not only is there a recognized exhaustion requirement, "the PLRA . . . requires proper exhaustion" as set forth in applicable administrative rules and policies of the institution. *Woodford*, 548 U.S. at 93.

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."

*Id.* at 90 (citation omitted). Indeed, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules[.]" *Id.*

In *Ross v. Blake*, the Supreme Court instructed that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'"  136 S. Ct. 1850, 1862 (2016).  For an administrative remedy to be available, the "remedy must be 'capable of use for the accomplishment of [its] purpose.'"  *Turner v. Burnside*, 541 F.3d 1077, 1084 (11th Cir. 2008) (quoting *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1322–23 (11th Cir. 2007)). The *Ross* Court identified three circumstances in which an administrative remedy would be considered "not available."  136 S. Ct. at 1862.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.*  Next, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  *Id.*  Finally, a remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 1860.

Because failure to exhaust administrative remedies is an affirmative defense, Defendants bear "the burden of proving that [Plaintiff] has failed to exhaust his available administrative remedies."  *Turner*, 541 F.3d at 1082.  The Eleventh Circuit has articulated a two-step process that the Court must employ when examining the issue of exhaustion of administrative remedies.

> In *Turner v. Burnside* we established a two-step process for resolving motions to dismiss prisoner lawsuits for failure to exhaust. 541 F.3d at 1082. First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true. The court should dismiss if the facts as stated by the prisoner show a failure to exhaust. *Id.* Second, if dismissal is not warranted on the

prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust. *Id.* at 1082–83; *see also id.* at 1082 (explaining that defendants bear the burden of showing a failure to exhaust).

*Whatley v. Warden, Ware State Prison*, 802 F.3d 1205, 1209 (11th Cir. 2015). And "[a] prisoner need not name any particular defendant in a grievance in order to properly exhaust his claim." *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1218 (11th Cir. 2010) (citations omitted).

State law "determines what steps are required to exhaust." *Dimanche v. Brown*, 783 F.3d 1204, 1207 (11th Cir. 2015); *see also Jones*, 549 U.S. at 218 (stating that "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion"). The FDOC provides inmates with a three-step grievance process for exhausting administrative remedies. As the Eleventh Circuit has described it:

> The grievance procedure applicable to Florida prisoners is set out in § 33-103 of the Florida Administrative Code. Section 33-103 contemplates a three-step sequential grievance procedure: (1) informal grievance; (2) formal grievance; and then (3) administrative appeal. *Dimanche*, 783 F.3d at 1211. Informal grievances are handled by the staff member responsible for the particular area of the problem at the institution; formal grievances are handled by the warden of the institution; and administrative appeals are handled by the Office of the Secretary of the FDOC. *See* Fla. Admin. Code. §§ 33-103.005–103.007. To exhaust these remedies, prisoners ordinarily must complete these steps in order and within the time limits set forth in § 33-103.011, and must either receive a response or wait a certain period of time before proceeding to the next step. *See id.* § 33-103.011(4).

*Pavao*, 679 F. App'x at 824. Further, an inmate may skip the informal and formal grievance steps and file a direct emergency grievance with the Office of the Secretary, if the issue involves an emergency, reprisal, protective management, admissible reading material, release date calculations, banking issues, sexual abuse committed by the warden, or HIPAA violations. Fla. Admin. Code r. 33-103.007(3)(a). When a prisoner

8

files a direct emergency grievance with the Secretary, he must do so "within 15 calendar days from the date on which the incident or action which is the subject of the grievance occurred." Fla. Admin. Code r. 33-103.011(d).

Here, Defendants argue Plaintiff failed to exhaust his administrative remedies because he did not properly follow the FDOC's three-step grievance process, and at all times the grievance procedure was available to him. (Doc. 30 at 9–14). In support of their exhaustion argument, Defendants provide: (1) the Declaration of Jacqueline Spanios, Grievance Coordinator at SCI; (2) the Declaration of Krissy Stanford, Assistant Warden at Colombia Correctional Institution; (3) grievance logs showing the informal and formal grievances Plaintiff filed between February 1, 2024, and February 25, 2025; (4) copies of Plaintiff's pertinent informal and formal grievances and responses thereto; (5) the Declaration of Lawanda Sanders-Williams, custodian of records for grievance appeals; (6) a grievance log showing the appeals Plaintiff filed between February 1, 2024, and February 25, 2025; and (7) copies of Plaintiff's appeals and responses thereto. (Doc. Nos. 30-4, 30-5, 30-6).

In response, Plaintiff asserts the grievance records demonstrate that he exhausted his claims related to the March 8, 2024 incident or, alternatively, that the grievance process was thwarted and became a "dead-end process," rendering it unavailable. (Doc. 35 at 7–9). Plaintiff submits a sworn affidavit to that effect, as well as some of the same grievance records Defendants provided. (Doc. Nos. 35-3, 35-4).

Accepting Plaintiff's view of the facts as true, the Court finds dismissal for lack of exhaustion is not warranted at the first step of *Turner*. Thus, the Court proceeds to the

second step and considers the parties' arguments about exhaustion and makes findings of fact.

At the outset, it is undisputed that the underlying basis of Plaintiff's Complaint is that on March 8, 2024, Defendants conspired to coordinate a "hit" on him in retaliation for filing grievances and a state court petition about his medical issues and housing, which involved Conover and Goodwin and that, subsequently, Conover and Bennett conspired to discard his grievances in an effort to protect the officers involved and prevent Plaintiff from pursuing this action. (Doc. 1 at 5–7, 9–12, 16–17). In other words, and as Plaintiff clarifies, the alleged February 2024 retaliatory transfer to L-dorm "merely set[s] forth the prelude that significantly connects the foundation of the retaliatory conspiracy by the [ ] Defendants" to attack him on March 8, 2024. (Doc. 35 at 1). As such, Plaintiff's grievances filed prior to March 8, 2024, are not pertinent to whether Plaintiff properly exhausted his administrative remedies for the claims underlying this action. Instead, the pre-March 8, 2024, grievances are relevant to Plaintiff's overall theory insofar as they establish, in his view, the basis for why Defendants allegedly retaliated against him by conspiring to "execute a hit."[8]

With that said, Plaintiff argues four administrative grievances conclusively demonstrate that he either exhausted his administrative remedies, or that the grievance procedure was rendered unavailable. (Doc. 35 at 7). First, he asserts informal grievance

---

[8] The informal and formal grievances Plaintiff filed prior to March 8, 2024, concern the separate issue of his rehousing to L-dorm, his requests to be moved back to O-dorm, and his allegations that Goodwin and Conover moved and kept him in L-dorm in retaliation for filing grievances and a state court petition related to his medical and confinement conditions. (Doc. 30-5 at 3–11, 13–16, 64–67). Plaintiff emphasizes that the three formal grievances on this matter were all denied on March 7, 2024, the day before the underlying incident.

Log No. 231-2403-0120 "constitutes exhaustion" because (1) it "gave prison officials notice of both Defendant Bennett's discarding of grievances and Defendant Conover's conspiracy retaliation"; and (2) the facility "deferred the matters to the [Office of the Inspector General ("OIG")] for further action" by responding, "All of them were reported on that issue." (*Id.* (citing Doc. 30-5 at 18)). But the record evidence shows that informal grievance Log No. 231-2403-0120 did not exhaust the claims here.

In Log No. 231-2403-0120, filed on March 15, 2024, Plaintiff complained that Bennett was mishandling or discarding his informal grievances, formal grievances, and grievance appeals, such that "the administrative process [was] being rendered unavailable to him and, the exhaustion of the PLRA requirements [were] being maliciously thwarted." (Doc. 30-5 at 18). He claimed that on March 11, 2024, he "personally handed" two grievances to "Ms. T. Friehoffer," which were "placed in the locked-box" and that Bennett "had to have removed and discarded them" because he never received the "Part-C receipt portion or any responses." (*Id.*). Plaintiff described the two grievances that he allegedly filed on March 11, 2024, as follows: "One was a direct 303-formal grievance for retaliation, naming Sgt. Conover [and] one was a[n] informal grievance about all my stolen property in [L-dorm] on [March 8, 2024]."[9] (*Id.*). Officials denied informal grievance Log No. 231-2403-0120 on March 25, 2024, stating that grievance Log Nos. 2402-231-045,

---

[9] The evidentiary materials include Plaintiff's informal grievance regarding his complaint of stolen property (Log No. 231-2403-0060). (Doc. 30-5 at 20). To be sure, it does not establish proper exhaustion of the instant claims because Plaintiff's chief complaint was that his personal property had been stolen and, despite some of it being returned, he was still missing his approved electric facial hair trimmer. (*Id.*). While Plaintiff mentioned the March 8, 2024 attack he allegedly endured, he did not allege that it was the result of a conspiracy by Defendants to retaliate against him. (*Id.*).

11

2402-231-046, and 2402-231-047 were all "reported on that issue."[10]  (*Id.*).  There is no evidence that Plaintiff filed a formal grievance following this denial.

Initially, regardless of whether a grievance puts the institution on notice of the inmate's claims, the inmate must properly comply with all steps of the process to satisfy proper exhaustion.  *See Woodford*, 548 U.S. at 90 (recognizing that the law requires "proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so properly" (internal quotations and citation omitted)).  Here, while officials responded by noting that Plaintiff's three formal grievances were "reported on that issue," informal grievance Log No. 231-2403-0120 was ultimately denied, and Plaintiff did not file a formal grievance.  (Doc. 30-5 at 18); *cf. Tierney v. Hattaway*, No. 3:20-cv-5738, 2022 WL 18159995, at *2 (N.D. Fla. Dec. 9, 2022) ("Given that Plaintiff's informal grievance was 'approved,' and the matter referred to the Inspector General, it would have been pointless for Plaintiff to appeal by filing a formal grievance."), *report and recommendation adopted*, 2023 WL 139132 (N.D. Fla. Jan. 9, 2023).  Also, the officials' response that "[a]ll of them were reported on that issue" was specifically directed to Plaintiff's three formal grievances, which concerned separate and unrelated claims regarding Conover and Goodwin rehousing and keeping Plaintiff in L-dorm throughout February 2024.  (Doc. 30-5 at 18).  In other words, this grievance and officials' denial neither contained allegations about his claims regarding the alleged March 8, 2024

---

[10] Log Nos. 2402-231-045, 2402-231-046, and 2402-231-047 were three formal grievances Plaintiff filed prior to March 8, 2024, alleging that Goodwin and Conover were retaliating against him by keeping him housed in L-dorm and that Conover purposely moved him to L-dorm in retaliation for his criminal case, his grievances, and per Goodwin's instructions.  (Doc. 30-5 at 13–16, 64–67).

incident, nor did Plaintiff file a formal grievance in compliance with the administrative procedures after receiving the denial.

Second, Plaintiff argues that informal grievance Log No. 231-2403-0119 constitutes exhaustion for similar reasons: it put the facility on notice of his claims, and the facility responded with, "Your allegations have been reported to the [OIG] at appropriate level." (Doc. 35 at 8).  But a review of the record evidence refutes Plaintiff's contention.   In informal grievance Log No. 231-2403-0119, filed on March 18, 2024, Plaintiff complained that the OIG failed to investigate Conover for her involvement in the March 8, 2024 incident.  (Doc. 30-5 at 19).  More specifically, Plaintiff alleged that on March 8, 2024, while in L-dorm, he was "brutally assaulted and robbed by approx[imately] 4-Black Muslim Gang Member inmates, whom [sic] were solicited by Sgt. Conover to execute a 'retaliation' 'hit' on my life." (*Id.*).  He asserted that the OIG failed to secure video evidence and investigate Conover, and he advised that a federal civil rights lawsuit would be filed such that the video evidence must be secured, and a proper criminal investigation be conducted.  (*Id.*).  On March 25, 2024, officials denied this informal grievance, stating, "Your allegations have been reported to the IG Office at [the] appropriate level." (*Id.*).  Plaintiff did not file a formal grievance following this denial.

Some courts have held that an investigation by the OIG may be relevant to an inmate's exhaustion efforts, but only when the investigation results directly from an inmate's grievance, regardless of whether the grievance is approved, denied, or returned. *See, e.g.*, *Luckey v. May*, No. 5:14-cv-315, 2016 WL 1128426, at *11 (N.D. Fla. Feb. 17, 2016) (finding the plaintiff exhausted his administrative remedies because his informal grievance was "approved" from the standpoint that his allegations had been referred to

13

the OIG), *report and recommendation adopted sub nom.*, 2016 WL 1169481 (N.D. Fla. Mar. 22, 2016); *Tierney*, 2022 WL 18159995, at *2 ("Given that [the plaintiff's] informal grievance was 'approved,' and the matter referred to the [OIG], it would have been pointless for [him] to appeal by filing a formal grievance."). However, if the OIG or the correctional institution happens to investigate an incident unrelated to the filing of a grievance, an inmate cannot be said to have exhausted his administrative remedies. *See Pavao*, 679 F. App'x at 825 ("[The plaintiff's] efforts to seek redress from the . . . [OIG] are not relevant to the question of exhaustion because they are not part of the prison grievance procedure, and therefore are outside the 'boundaries of proper exhaustion.'" (quoting *Dimanche*, 783 F.3d at 1210)); *see also Fleming v. Espino*, No. 3:20-cv-853, 2021 WL 5083743, at *7 (M.D. Fla. Nov. 2, 2021) (concluding the OIG investigation was not relevant to the exhaustion analysis where there was no indication the investigation resulted from a grievance filed by the inmate).

Here, there is no indication Plaintiff's grievance efforts directly resulted in an official investigation of the March 8, 2024 incident. Rather, it could have resulted from the FDOC's regular practice of reviewing all uses of force. *See* Fla. Admin. Code r. 33-602.210(10)(a)–(f) (requiring the warden or his designee and the OIG to review every use of force to determine whether it was lawful and procedurally appropriate). Indeed, that the response notes the allegations were reported to the OIG indicates only that the OIG "may have substantively reviewed [Plaintiff's] complaint outside of the grievance process, not that the Secretary's Office addressed and resolved the merits of [Plaintiff's] . . . claims." *Moultrie v. James*, No. 24-12561, 2025 WL 3528695, at *4 (11th Cir. Dec. 9, 2025) (citing *Woodford*, 548 U.S. at 90, 93). Also, informal grievance Log No.

14

231-2403-0119 was ultimately denied, and Plaintiff did not proceed to the next step by filing a formal grievance. To the extent Plaintiff suggests that following through with the grievance procedure would have been futile given the incident was already referred to the OIG for investigation, the Eleventh Circuit has expressly rejected such an argument. *See Varner v. Shepard*, 11 F.4th 1252, 1264 (11th Cir. 2021) (recognizing the Eleventh Circuit has declined to create a futility exception to the PLRA, even when an inmate receives all the relief he could have (internal investigation of the incident) had he properly followed the applicable administrative process).

Third, Plaintiff relies on informal grievance Log No. 510-2404-0535, which he filed on April 16, 2024.[11] (Doc. 30-5 at 42). According to Plaintiff, because this informal grievance was approved, it constitutes exhaustion and "substantiates that the grievance process, specifically for the March 8, 2024, conspiracy, became a dead-end process." (Doc. 35 at 8). But again, the record evidence establishes that this informal grievance did not exhaust Plaintiff's administrative remedies.

In informal grievance Log No. 510-2404-0535, Plaintiff again complained that Bennett was mishandling his grievances at SCI. (Doc. 30-5 at 42). He claimed that on March 11, 2024, he submitted two grievances (one direct 303-formal and one informal), both of which addressed "the retaliation/assault that I suffered by Officer D. Conover," but he never received any Part-C receipts or Part-B responses; he claimed these submissions would be "on camera." (*Id.*). Plaintiff further explained that on April 1, 2024, he "proceeded to the next level" by filing three "303-formal appeals" to the Secretary level

---

[11] At this point, Plaintiff had been transported to Charlotte Correctional Institution ("**CCI**"). (Doc. 1 at 15).

15

but never received Part-C receipts or Part-B responses. (*Id.*). Plaintiff then specifically requested that he be provided with records of all his grievances or be permitted to "re-file." (*Id.*). On April 29, 2024, officials responded to this informal grievance as follows:

> Your informal grievance has been received, reviewed and evaluated.
>
> Suwannee Correctional was contacted and provided the attached copies. I have printed your receipts from the Central Office grievances. Your responses were mailed on 4/24/24 so you should be receiving those soon.
>
> Per Suwannee: Fixed wing video would not be able to be reviewed as the 30-day retention period has lapsed and would only indicate an inmate placed an item in the grievance box not what the item was or contained. The inmate has not provided any evidence that any additional grievances were filed in accordance with Ch. 33-103. No evidence of staff discarding grievances was found. [March 11, 2024] Informal attached for reference, [March 11, 2024] – no record of formal filed.
>
> Approved to receive copies only.

(*Id.*). Thus, informal grievance Log No. 510-2404-0535 was expressly approved only as to Plaintiff receiving copies of his grievance records. (Doc. 30-5 at 42). Plaintiff had requested all records of his grievances filed between March 11, 2024, and April 16, 2024, and officials approved that request and provided corresponding records. (Doc. 30-5 at 42–48). Importantly, in the response, the officials noted that there was no record of a formal grievance filed by Plaintiff on March 11, 2024; only an informal grievance was filed by Plaintiff on that date. (*Id.*). Contrary to Plaintiff's position, the limited approval to receive copies of his grievance records does not establish proper exhaustion.

Finally, the last grievance Plaintiff relies on to establish proper exhaustion is his "Secretary-Appeal" Log No. 24-6-11293, filed on April 1, 2024.[12] (Doc. 35 at 9 (citing Doc.

---

[12] Plaintiff filed two other appeals on April 1, 2024, (Log Nos. 24-6-11294 and 24-6-11296), which were identical in substance. (Doc. 30-6 at 4, 12–13, 16–17). However,

30-6 at 15)).  According to Plaintiff, this appeal demonstrates that the process was a dead-end "when the only two missing grievances related to the March 8, 2024 conspiracy/retaliation were cherry-picked and discarded."[13]   (*Id.*).   As such, Plaintiff asserts that he properly and timely proceeded to the appeal level of the administrative grievance procedure pursuant to rules 33-103.011(1)(c) and 33-103.011(4), FAC.  (*Id.*).

A review of the record shows that in grievance Log No. 24-6-11293 to the Secretary, Plaintiff claimed, like he had in other various grievances, that on March 11, 2024, while in confinement at SCI and on camera, he filed a "direct formal grievance of 'REPRISAL' against Sgt. D. Conover for soliciting/recruiting 5-Black Muslin Gang Member inmates to commit battery-upon-a-detainee and brutally beat and assault and rob me on March 8, 2024[.]" (Doc. 30-6 at 15).  He again claimed that he never received a response to that direct formal grievance, and when the response time expired on March 31, 2024, he proceeded to the next step by submitting the instant "Secretary-Appeal." (*Id.*).  Plaintiff went on to allege that Conover retaliated against him for filing three housing grievances and a state court emergency petition against her by soliciting and paying 5 gang-member inmates to beat and rob him on March 8, 2024.  (*Id.*).  On April 10, 2024, the Secretary returned Plaintiff's appeal without action, explaining as follows:

---

while Plaintiff referenced the March 8, 2024 incident in these two other appeals, both addressed the separate rehousing retaliation issue.  (*Id.* at 12–13, 16–17).

[13] Plaintiff has made clear that he believes a March 11, 2024 "direct 303-formal grievance" alleging retaliation and conspiracy against Conover is missing, as he has routinely claimed that it "had to have" been discarded by Bennett.  (Doc. 1 at 13; Doc. 30-5 at 18, 42).  But what is unclear is which other grievance Plaintiff is referring to as having gone missing.  To the extent he is referring to the other grievance filed on March 11, 2024, that informal grievance (Log No. 231-2403-0060), which concerned his stolen property, is accounted for.  To the extent Plaintiff claims he filed another informal or formal grievance on March 11, 2024, the evidentiary materials demonstrate he did not.

17

This grievance is not accepted as a grievance of reprisal.

Your request for administrative appeal is in non-compliance with the Rules of the Department of Corrections, Chapter 33-103, Inmate Grievance Procedure. The rule requires that you first submit your grievance at the appropriate level at the institution. You have not done so, or you have not provided this office with a copy of that grievance, nor have you provided a valid or acceptable reason for not following the rules.

Your issue regarding the grievance process is a separate issue and should be grieved as such, also, being initiated at the appropriate level.

When making allegations of staff misconduct, you need to provide all pertinent information, such as names, dates, times, places, and specific details, for a proper review.

The institution should be given the opportunity to respond to your issue.

Upon receipt of this response, if you are within the allowable time frames for processing a grievance, you may resubmit your grievance at your current location in compliance with Chapter 33-103, Inmate Grievance Procedure.

Based on the foregoing information, your grievance is returned without action.

(*Id.* at 14).

While Plaintiff is correct that he is permitted to proceed to the next level upon expiration of the time in which officials must respond, the propriety of him doing so here turns on whether he did, in fact, file the direct formal grievance of reprisal on March 11, 2024, as he so claims. The evidentiary materials establish he did not. First and foremost, the formal grievance log attached to Stanford's Declaration establishes that Plaintiff filed four formal grievances while at SCI, all of which were filed in February 2024. (Doc. 30-5 at 4).

Additionally, in response to informal grievance Log No. 510-2404-0535, officials specifically advised that there was no record of a formal grievance filed by Plaintiff on March 11, 2024. (*Id.* at 42). Moreover, attached to Plaintiff's Complaint is an inmate

18

request filed on January 29, 2025, wherein Plaintiff again requested records related to his formal grievance that he allegedly filed at SCI in March 2024. (Doc. 1-1 at 46). In response, officials stated, "there is no record of any formal grievances being filed by you at [SCI] in March of 2024. There are however, two (2) appeals to the Secretary."[14] (*Id.*). In a follow-up request filed on February 5, 2025, Plaintiff provided clarification on his records request but again stated that there should be a "formal grievance logged about this assault in the month of March 2024." (*Id.* at 47). In response, officials provided him with "everything" they could find, which included records of Plaintiff's informal grievances and appeals only. (*Id.*). Thus, several documents in the record establish that Plaintiff never filed a direct formal grievance on March 11, 2024, related to the March 8 events, as he so claims, which in turn establishes that Plaintiff's "Secretary-Appeal" Log No. 24-6-11293 rested on a faulty premise, i.e., that it was being filed after receiving no response to his March 11, 2024 direct formal grievance.

As to allegations that the grievance procedure was unavailable to Plaintiff, Plaintiff asserts that the missing March 11, 2024 direct formal grievance upon which he relies heavily to establish proper exhaustion "had to have" been discarded by Bennett. But his unsubstantiated allegations lack credibility, and the record evidence refutes this position. *See Whatley v. Smith*, 898 F.3d 1072, 1083 (11th Cir. 2018) (affirming the district court's weighing of the evidence and "credit[ing] the defendants' affidavits over [the plaintiff's] exhibits" at *Turner* step two when the plaintiff claimed the defendants "deliberately lost or destroyed" his grievance associated with the incident). Indeed, Plaintiff's assertion that

---

[14] The evidentiary materials indicate that these two referenced Secretary appeals were both filed on March 1, 2024, and concerned different matters. (Doc. 30-6 at 3, 8–11).

"any/all grievances pertaining to this incident or naming Defendants Conover and Goodwin were thwarted" by Bennett discarding them is conclusively refuted by the evidentiary materials.  (Doc. 30-5 at 13–16, 18–20, 64–67).  Also, Spanios' Declaration establishes that the grievance process at SCI "is designed in such a manner that there is no hindrance nor impediment to any inmate's utilization of the grievance procedure at any level."  (Doc. 30-4 at 1–2).  Moreover, where at least one of Plaintiff's grievances was responded to by advising that his allegations were reported to the OIG, Plaintiff's claim that a prison official was discarding grievances is undermined.[15]  *See Fleming*, 2021 WL 5083743, at *6 (stating that the prison officials' reporting of the plaintiff's allegations to the Office of the Inspector General undermines the plaintiff's "claim that correctional officers were lying or otherwise attempting to prevent him from submitting grievances about the alleged assault or covering it up").

Finally, accepting as true that Plaintiff was not receiving responses to the several grievances he filed pertaining to the March 8, 2024 incident, that fact does not excuse him from properly proceeding to the next level of the grievance process.  *See* Fla. Admin. Code r. 33-103.011; *see also Pavao*, 679 F. App'x at 825–26.  For instance, even assuming Plaintiff never received responses to informal grievance Log Nos. 231-2403-0120 and 213-2403-0119, which both addressed the March 8, 2024 incident and were received by the facility on March 18, 2024, Plaintiff never proceeded to the next step by filing formal grievances following the expiration of time for officials to respond, which

---

[15] In fact, it was Bennett—the very person Plaintiff accuses of discarding his grievances relating to the March 8, 2024 incident—who advised Plaintiff that his allegations had been reported to the OIG.  (Doc. 30-5 at 19).

20

would have been April 2, 2024.  *See* Fla. Admin. Code r. 33-103.011(3)(a); (Doc. 30-5 at 18–19).

Based on the foregoing, the Court finds that Defendants have carried their burden to demonstrate that Plaintiff did not properly exhaust his administrative remedies before bringing this action.  Additionally, the Court finds that the grievance process was available to Plaintiff and, therefore, he was not excused from the PLRA's exhaustion requirement before initiating this action.

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Motion to Dismiss (Doc. 30) is **GRANTED** to the extent described herein.  This case is **DISMISSED without prejudice** for Plaintiff's failure to exhaust his administrative remedies.

2. The **Clerk** shall enter judgment accordingly, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, on July 14, 2026.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

CC-ORL
C:    Luis Munuzuri Harris, #V09696
       Counsel of Record

21